OPINION OF THE COURT
Betsy Barros, J.
The instant application filed on November 1, 2011 is for the appointment of a foreign guardian, pursuant to Mental Hygiene Law § 81.18. The petitioner, Ahmed Mohamed Gabr, is a son from the first marriage of Mohamed Ahmed Mohamed Gabr, the alleged incapacitated person (hereinafter the AIP), and is the AIP’s foreign guardian appointed on appeal in Egypt, following the trial court’s dismissal of the original guardianship proceeding.[1]
The October 26, 2011 petition avers as follows: that the AIP worked and lived for many years in the United States, retired and returned to his native Egypt in 2000, where he took up permanent residence in one of his Cairo apartments, and that in 2001 the AIP married Sana’a Mohamed Gabr (hereinafter Sana’a), who then embarked on a course of financial exploita *748 tion of the AIR to wit: after he suffered a stroke in 2002, Sana’a forced or unduly influenced the AIP to deed over his Red Sea property to her and dissipated 2,000,000 Egyptian pounds of the AIP’s funds.[2]
Despite his appointment as guardian in Egypt, the petitioner asserts that he was unable to marshal the AIP’s New York State Chase bank account with the Egyptian guardianship order. The Chase bank account is funded with the AIP’s Social Security benefits (approximately $1,000 per month) and his small Citibank pension (approximately $300 per month).[3]
The following facts are uncontested: (1) the AIP was an Egyptian resident from 2000 until the instant filing; (2) the AIP married Sana’a in 2001; and (3) the petitioner is the AIP’s appointed guardian pursuant to Egyptian law and has full authority over his property in Egypt.
Legal Analysis
The public policy of Mental Hygiene Law article 81 affords incapacitated persons due process in guardianship proceedings, a participation in the parameters of guardianship, and a say in the appointment of guardians. The legislative intent underlying New York State’s Mental Hygiene Law article 81 is to confer upon respondents a full array of procedural and substantive rights. The statute is designed to preserve as much autonomy, self-determination and dignity, as is safely possible, for persons found to be incapacitated.
In the instant proceeding, petitioner, pursuant to Mental Hygiene Law § 81.18, seeks to be appointed New York foreign guardian of the AIP’s bank account, which is funded from the AIP’s monthly benefits. Mental Hygiene Law § 81.18 permits the appointment of a property guardian for someone who is absent from New York State but for whom another jurisdiction has appointed a guardian. Such application is directed to the court’s sound broad discretion and reads:
“§ 81.18 Foreign guardian for a person not present in the state
“Where the person alleged to be incapacitated is not present in the state and a guardian, by whatever name designated, has been duly appointed pursuant *749 to the laws of any other state, territory, or country where the person alleged to be incapacitated resides to assist such person in property management, the court in its discretion, may make an order appointing the foreign guardian as a guardian under this article with powers with respect to property management within this state on the foreign guardian’s giving such security as the court deems proper.” (Emphasis added.)
Rights of AIPs in New York
Mental Hygiene Law article 81 codifies a broad array of due process rights for AIPs, most notably: notice by personal delivery (Mental Hygiene Law § 81.07 [e] [2] [i]); his/her right to a speedy hearing (Mental Hygiene Law § 81.07 [b] [1]); the right to counsel of his/her own choosing or to court appointed counsel (Mental Hygiene Law §§ 81.10, 81.09 [c]); and his/her right to a jury trial on the issue of capacity (Mental Hygiene Law §§81.07 [d]; 81.11 [f]). The burden of proof rests solely on the petitioner; a finding of incapacity must be based on clear and convincing evidence; and the rules of evidence apply. (Mental Hygiene Law § 81.12; Matter of Jacobs, 167 Misc 2d 766 [1995].) Under New York law, before appointing a guardian the court must find the AIP functionally incapacitated, unable to appreciate his/her functional limitations, and without sufficient advance directives or other measures in place to safeguard his/her person and/or property. Moreover, the appointment of a guardian must be the least restrictive alternative, and the court must take into account the AIP’s wishes, preferences and desires to the extent that these can be ascertained. (Mental Hygiene Law §§ 81.01, 81.02.)
Based upon New York’s public policy, heightened vigilance is required when adjudicating an individual’s capacity. Because New York State’s public policy is scrupulous in protecting the rights and dignity of its arguably most vulnerable citizens, New York has, in fact, declined to accord full faith and credit to a sister state’s determination of incapacity. Similarly, the court may only grant comity to a foreign country’s guardianship decision if it is satisfied that the foreign jurisdiction affords the AIP substantially similar due process and substantive rights as exist under Mental Hygiene Law article 81.[4] In effect, New York’s public policy dictates that foreign guardianship applications be *750 carefully scrutinized and considered on a case by case basis. If the court finds that the foreign jurisdiction has not provided the AIP with sufficient due process and substantive rights, a de novo hearing is required. (See Seitz Estates, Inc. v Seitz, 226 App Div 373 [1st Dept 1929]; Matter of Whitehead, 169 Misc 2d 554 [Sup Ct, Suffolk County 1996]; Matter of Sulzberger, 159 Misc 2d 236 [Sup Ct, NY County 1993].)[5]
Examination of the Egyptian Order
In deciding whether or not to grant comity to the Egyptian guardianship order, this court considered the petitioner’s submissions and examined the foreign jurisdiction’s substantive and procedural requirements for the appointment of a guardian.[6]
The Egyptian court seemingly rests its guardianship decision in large measure on medical tests performed by the Egyptian Forensic Medical Department:
“The necessary x-rays showed cerebral infiltrates scattered on both sides, including cerebral sclerosis and elderly manifestations consistent with his age; and concluded that the patient was suffering from organic diseases and senile dementia with severe impairment of concentration and memory, due to atherosclerosis and hypertension. As such, his present or future financial actions would be doubtful.” (Gabr v Gabr, Cairo Ct App, Family Affairs Dept, Aug. 12, 2010, case No. 5611 at 4.)
The Egyptian court explicitly states its legal standard for the appointment of a guardian.
“And Whereas the Law has specified the reasons for *751 interdiction to be: madness, aphrenia ‘[sic]’, prodigality and inadvertence: and whereas madness and aphrenia ‘[sic]’ are organic diseases for the diagnosis of which, the opinion of specialized experts should be sought. They are either psychiatric diseases or mental diseases ... As for the physically originating mental diseases, these may arise out of the decay in the brain tissues, or microbic pollution or from a swelling or cerebrosclerosis. Under this category comes senility dotage which means the deficiency of mental faculties coping with the physical deficiency of old age, where all or some of the mental faculties deteriorate, particularly as concerning the memory. A patient of this type dotes and confuses matters; or may be readily irritated, or too good- hearted and naive as young children.” (Id. at 5.)
The Egyptian appellate court bases its decision on physical changes in the alleged incapacitated person’s brain without addressing, as would be statutorily required in this jurisdiction, the AIP’s functional level as well as any safeguards in place to protect him.[7] Additionally, Egyptian law governing who may be appointed guardian differs drastically from that of New York. “And Whereas it is legally established that the guardianship be vested in the adult son, then the father, then in the grandfather and thereafter be vested in whoever the Court may chose, in operation of Article 68 of Law No 119 for 1952.” (Id. at 6.) New York law has no such gender bias in the appointment of a guardian.[8] Mental Hygiene Law § 81.19, which governs eligibility of guardians, is gender neutral and, in fact, lists the spouse as the first appointee.
The petitioner fails to demonstrate that the AIP’s due process rights were protected. It appears that in the Egyptian proceeding, the AIP may have been required to give evidence *752 against himself by undergoing medical tests, and having those medical tests admitted into evidence — none of which could have been mandated by this court. (See Matter of Rosa B.-S. [William M.B.], 1 AD3d 355 [2d Dept 2003]; Matter of A.G., 6 Misc 3d 447 [Sup Ct, Broome County 2004].)
Having found Egyptian proceedings both procedurally and substantively in conflict with New York guardianship law and inconsistent with the public policy of this state, this court did not grant the foreign guardianship comity and directed a full hearing on notice to the AIP and his wife, with whom he resides.[9]
The Proceeding
The order to show cause signed on November 7, 2011, restrained the AIP’s Chase bank account, pending a hearing on the motion, and appointed Mental Hygiene Legal Services as court evaluator. On January 12, 2012, the first appearance, the court directed that the AIP’s wife be served with the order to show cause and notice of proceeding and that the petitioner inform the court whether any Social Security Administration regulations allow a foreign guardian to marshal benefits. The trial was commenced on March 28, 2012. The AIP’s wife participated by phone. It became clear that the AIP and his wife wanted to participate more fully in this matter, and when the court was apprised that they had come to New York for this purpose, counsel was appointed for the AIP The AIP filed a motion nominating his wife guardian, and the matter was commenced de novo.[10] The trial dates were June 4, 2012, June 5, 2012, and August 6, 2012. The evidence will be summarized for purposes of this decision.
The Petitioner’s Evidence
Petitioner’s testimony revealed that he had been estranged from his father and had had very little contact with him before *753 visiting Egypt sometime in 2006 and that he had been in immediate conflict with the AIP and his wife.[11]
Petitioner testified that he could account for the money he collected and spent as Egyptian guardian, but when pressed on the issue testified that all his transactions were in cash and that the receipts he had kept were now in the possession of the Cairo District Attorney. In response to the court’s directive that he produce accountings, petitioner produced a ledger of expenses that appeared to have all been written in one day and with the same pen. Despite an Egyptian spousal support order, the petitioner refused to comply with said order, claiming that in fact Sana’a owed him money for his legal costs.
Petitioner’s accusations of Sana’a’s misdeeds proved false. Closer examination revealed the following: (1) the $330,000 (some 2,000,000 Egyptian pounds) withdrawn by Sana’a was not a “grab for assets,” but instead had been withdrawn over the entire length of the marriage to support their lifestyle, (2) the car Sana’a had transferred to her name was a 10-year-old Daewoo that the AIP could no longer drive, and (3) the chalet the AIP deeded to Sana’a was in fact a property constructed and maintained for the most part with Sana’a’s own funds.
Petitioner appeared unreliable and disingenuous. Petitioner testified that he is currently without any means of support and that he has filed for bankruptcy. Although much of petitioner’s testimony was disconcerting and vague, one thing was crystal clear — his absolute contempt for Sana’a and his relentless pursuit to divest her of any ownership interest in the AIP’s estate.[12]
Sana’a’s Evidence
Sana’a testified that she had had a long contentious relationship with the petitioner. She and the petitioner were involved in multiple avenues of litigation in Egypt. Sana’a maintained that the petitioner had returned to Egypt in 2006 to file for guardianship not out of concern for the AIP, but at the behest of the AIP’s brother, and the latter’s concern to maintain family ownership of the Cairo apartments.
*754 According to Sana’a, the petitioner had thwarted her attempts to have the AIP seen by physicians of her choice. She testified credibly that she cares for her husband and that he relies on her. According to her, she supports the AIP financially and has been exhausting her funds to do so at an ever increasing rate once the petitioner was appointed as guardian in Egypt.
The AIP’s Testimony
Although wheelchair bound and exhibiting some cognitive loss, such as not remembering his Cairo address, the AIP impressed this court with the amount of trust he placed in his wife. The AIP testified that his wife was his main caretaker since their marriage. It also appeared that he had sufficient capacity to designate her his health care proxy, to add her name to any joint account he had, and to appoint her as his attorney-in-fact. The court observed that the AIP was very comfortable with Sana’a and that each showed genuine affection for the other.
Court Evaluator’s Report
Based in large part on his interview with the AIR the court evaluator’s amended report was entered into evidence. In said report, the AIP emphatically objected to the appointment of the petitioner as his guardian and explained that all of the transfers he had made to his wife were intended to provide her with financial security upon his demise.
Conclusion
This court cannot appoint the foreign guardian as guardian in this matter. He has no means of support and has been declared bankrupt (Mental Hygiene Law § 81.19 [d] [5]). Moreover, despite a court order from Egypt, the petitioner has not supported his father or his father’s wife for years. His extreme animus toward Sana’a, his father’s nominated guardian, current primary caregiver and chosen companion, likewise makes his appointment untenable. (See Mental Hygiene Law §§ 81.17, 81.19 [d] [2], [3], [8].)
This court finds no need to appoint any property guardian because the AIR by allowing his spouse access to his New York funds, has basically exercised his right to make an appropriate advanced directive as to said property (Matter of Presbyt. Hosp. [Early], NYLJ, July 2, 1993 at 22, col 2, 1993 NY Misc LEXIS 627 [1993]).
*755 Accordingly, it is hereby ordered, that the petition to appoint a foreign guardian to manage the AIP’s New York property is denied in its entirety; and it is further ordered, that if the AIP anticipates leaving this jurisdiction he may request that his wife be appointed his foreign property guardian by letter application; and it is further ordered, that in conformity with the AIP’s expressed desires and consent, his spouse Sana’a Gabr is appointed as personal needs guardian pursuant to Mental Hygiene Law § 81.16 (c) (1), as this court finds the AIP to be a person in need of assistance, and an order and judgment so appointing her shall issue from chambers and address the issue of attorneys fees and court evaluator fees; and it is further ordered, that all relief not specifically granted is denied.

. It is unclear to this court if there is any further appeal available to the AIP or to Sana’a Gabr, his wife. Consistent with Sana’a Gabr’s assertion that she was not notified of the appeal, her name does not appear in the Cairo Court of Appeals — personal status judgment, annexed to the petitioner’s order to show cause. There was a great deal of discussion on the record about multiple legal proceedings pending between Sana’a Gabr and the petitioner, including, but not limited to, the petitioner’s attempts to file criminal charges against Sana’a Gabr as well as Sana’a Gabr’s own application against the petitioner for spousal support.

. The petitioner claims that the 2,000,000 Egyptian pounds purportedly dissipated are worth approximately $330,000 American dollars.

. During the hearing, it became apparent that the monthly sum of $1,300 would support a very comfortable lifestyle in Egypt.

. In 1993, following a three-year study and consistent with a national movement to afford incapacitated persons greater civil rights, the current *750 system of guardianship (Mental Hygiene Law art 81) was implemented, ending the previous system of conservatorship (property control) and committee (personal needs and property control). (See 1990 NY Legis Doc No. 65; 1989 NY Legis Doc No. 65 [C].) As part of that reform, AIPs were granted procedural due process; the focus of the court hearing became functional disability; the AIP’s legally advanced directives were to be honored, and guardianships were to be tailored and limited to suit the needs of the AIR (Rose Mary Bailly, Practice Commentaries, McKinney’s Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.01.)

. The due process and procedural safeguards afforded AIPs pursuant to Mental Hygiene Law article 81 are not mere intellectual or philosophical exercises, but are meant to assure that the courts craft guardianship orders that, to the extent possible, preserve and respect the lifestyle, estate planning, and social and familial relationships that the AIP chose when he/she had capacity.

. The petitioner annexed a translated copy of the Egyptian appellate court decision appointing him guardian of his father.

. Said decision fails to note even one activity of daily living that the AIP is unable to perform, e.g., feed or dress himself. It never discusses whether less intrusive measures would suffice to protect him, his wishes and desires, or his particular level of self-awareness.

. Mental Hygiene Law § 81.19’s listing of priority of who should be appointed guardian codifies common sense, to wit: an AIP’s spouse is most likely to be the person who knows the AIP best and is most trusted by the AIP This “natural order” has likewise been codified in the Family Health Care Decisions Act. (Public Health Law § 2294-d [1].) After a court appointed guardian, a person’s spouse is the next designated surrogate, provided that the spouse is not separated from the patient.

. Pursuant to Mental Hygiene Law § 81.07 (g) (1) (i), Sana’a is entitled to notice of the proceeding not only as the spouse of the AH] but as a person with whom the AIP resides. It was determined that she had not received notice of these proceedings. Moreover, petitioner failed to proffer any facts to demonstrate the AIP or his spouse had been granted an opportunity to fully participate in the Egyptian proceedings.

. The AIP’s cross motion also asked for money judgments against the petitioner for money spent from the AIP’s assets in Egypt. That claim would be more suitably brought in Egypt and in fact may be a matter of pending litigation there. The AIP also seeks full compensation from the petitioner for the costs of this litigation.

. The AIP’s critical illnesses occurred in 2002 and 2004.

. Petitioner admitted on the stand that he lied in his sworn guardianship petition about where he resided, that he deliberately defied the Egyptian spousal support order, and that he was considering bringing an annulment action against Sana’a because she did not wear a veil, as his father purportedly had wanted.